UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| PINNACLE PIZZA CO., INC., | ) | CIV. 04-4170-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING |
| | ) | DEFENDANTS' MOTION |
| LITTLE CAESAR ENTERPRISES, INC., | ) | FOR SUMMARY JUDGMENT |
| a Michigan corporation; | ) | |
| LC TRADEMARKS, INC., | ) | |
| a Michigan corporation; and | ) | |
| ILITCH HOLDINGS INC., | ) | |
| a Michigan corporation | ) | |
| | ) | |
| Defendants. | ) | |

Defendants, Little Caesar Enterprises, Inc., LC Trademarks, Inc., and
Ilitch Holdings, Inc. (LCE), move for summary judgment on the claims asserted
against them by plaintiff, Pinnacle Pizza Co., Inc. (Pinnacle).  Pinnacle moves
for partial summary judgment on the counterclaim asserted by LCE and on
defendants' affirmative defenses.  LCE's motion for summary judgment is
granted.

**FACTUAL BACKGROUND**

Pinnacle was formed in 1991 by Jim Fischer and Mike Nichols to own
and operate Little Caesar's pizza franchises in South Dakota, Minnesota, and
Iowa.  Pinnacle entered into a franchise agreement with LCE for each franchise
store.  The franchise agreements were substantially similar in form.

Pinnacle asserts that during the mid 1990s its franchise stores, consistent with Little Caesar's franchise and company stores nationwide, did poorly financially.  In response to this downturn, in 1997 owner Jim Fischer began a new advertising strategy wherein he guaranteed customers could purchase a medium pepperoni pizza for four dollars every Tuesday, and that the pizza would be ready within five minutes of the customer's arrival at the store.  PSUMF 11.  Fischer advertised this offer with the phrase "Hot N' Ready," a phrase Fischer asserts he "prominently and consistently" used in Pinnacle's advertising pieces since its inception.  PSUMF 12.

Pinnacle asserts that the "Hot N' Ready" concept was extremely successful and allowed Pinnacle to stabilize its business.  PSUMF 14. Pinnacle asserts that other Little Caesar's franchise stores began to mimic the "Hot N' Ready" concept after observing Pinnacle's success.  PSUMF 16.  In its second amended complaint, Pinnacle alleges that three years after Fischer began advertising the "Hot N' Ready" concept, LCE wrongfully began using Pinnacle's "original advertising materials" without its consent in violation of the Franchise Agreement.  Docket 101, ¶ 30.

LCE's version of the evolution of the "Hot N' Ready" concept differs in many respects from that put forth by Pinnacle.  LCE asserts that beginning in 1992 it encouraged franchisees to hold "Customer Appreciation Days" once per quarter, in which ready-for-pick-up pizzas were sold at a discounted price.

2

DSUMF 37-38.  LCE asserts that Fischer's "Hot N' Ready" concept was born only after he was exposed to sales presentations by LCE and other franchisees that contained components of the concept.  LCE further asserts that Fischer shared his "Hot N' Ready" concept with other franchisees and imposed no restriction on the other franchisees' further spread of the concept.  DSUMF 86-87.

LCE asserts that a memorandum prepared by Scott Stewart, a franchisee who owned Little Caesar's stores in Rapid City, South Dakota, and with whom Fischer shared the "Hot N' Ready" concept, described the "Hot and Ready" program as "the best local promo we have done in a long time."  Docket 179 at ¶ 96.  Stewart's memo was included in a booklet of marketing ideas that was distributed by LCE to all franchisees.  DSMF 97.  Stewart also gave a presentation regarding the "Hot N' Ready" concept in October of 1997, at a Little Caesar's workshop in Tennessee.  DSUMF 98.

LCE asserts that subsequent to Stewart's presentation, it further promoted the "hot and ready" idea to franchisees.  By 1999, LCE provided all franchisees with advertising material which featured the "Hot-N-Ready" phrase.  DSUMF 106.  In June of 2000, LCE sent franchisees a "Hot-N-Ready" implementation guide, which Pinnacle received.  DSMF 109.  Pinnacle does not dispute that in late 2000, an LCE executive visited Fischer in Sioux Falls,

South Dakota, and told Fischer that LCE intended to roll out the "Hot N' Ready" concept as a national program.  DSUMF 110.

LCE has used the "Hot N' Ready" concept in its corporate stores and has asked independent franchisees to break out "Hot N' Ready" sales in sales reports.  DSUMF 108.  In 2002, LCE filed an application with the United States Patent and Trademark Office (USPTO) to register the phrase "Hot N' Ready" as a trademark.  In that application, LCE represented that the date of first use of the mark was May 6, 1997.  Docket 101, Ex. 4 at 4.  LCE was ultimately successful in obtaining a federal service mark registration for "Hot N' Ready."  DSUMF 129.

Pinnacle filed suit against LCE alleging a variety of claims stemming from LCE's use of the "Hot N' Ready" concept.  Pinnacle's second amended complaint, as construed by this court, asserts a cause of action for breach of contract, violation of the South Dakota Franchise Act, breach of fiduciary duty and confidential relationship, and violation of South Dakota trademark law. Pinnacle also asserts a claim to cancel LCE's registered trademark with the USPTO.  LCE filed a counterclaim for breach of contract, arguing that by challenging the validity of LCE's registered mark, Pinnacle breached the Franchise Agreement.

In its motion for summary judgment, LCE asserts that Pinnacle released it from these claims in a series of releases signed from 2000 through 2003.

4

LCE also argues that the majority of Pinnacle's claims are barred by the statute of limitations and doctrines of equity. Additionally, LCE moves for summary judgment on the merits of the claims. Pinnacle moves for partial summary judgment on LCE's counterclaim as well as on LCE's affirmative defenses.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving

party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980).  The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

**DISCUSSION**

**I.    Releases**

LCE seeks summary judgment, in part, asserting that Pinnacle has released it from liability.  Pinnacle seeks partial summary judgment on the validity and legal effect of the releases, asserting that the releases do not protect LCE from liability on its claims related to the "Hot N' Ready" concept.

From 2000 to 2003, Pinnacle was a party to a total of four releases with LCE.  The first two releases were signed in March and May of 2000 in conjunction with the sale of Pinnacle's franchise located in Sioux City, Iowa. The third release was signed in September of 2001 and was the result of a class action settlement between Little Caesar's franchisees and LCE.  The fourth release was executed in conjunction with the November 2003 sale of a Little Caesar's franchise in St. Cloud, Minnesota.

6

### A.    March and May 2000 Releases

Pursuant to the Franchise Agreement, Pinnacle was required to resolve its outstanding debt with LCE of approximately $400,000 before LCE would approve the sale of Pinnacle's Iowa City, Iowa franchise to a third party. DSUMF 112.  In the franchise termination and surrender agreement, dated March 31, 2000, Fischer in his capacity as "President" and both Fischer and Nichols in their individual capacities, signed the following release:

> The undersigned hereby release and forever discharge Little Caesar Enterprises, Inc., its agents, employees, officers, directors, successors, assigns, and related entities and corporations (collectively, "LCE") from any and all claims, actions, liabilities, causes of action, losses, expenses or damages of any kind, nature or description whatsoever, known or unknown, vested or contingent, arising out of any matter, fact, event or occurrence whatsoever or in any manner relating to or connected with the Franchise Agreements terminated hereby, the franchise relationship, the Little Caesar restaurants identified herein, or LCE and its related entities.

Docket 179, Ex. 58.

With regard to the outstanding debt, Pinnacle agreed to pay approximately $188,000 in cash to LCE and signed promissory notes to LCE for approximately $180,000.  DSUMF 115.  LCE agreed to forgive the promissory notes if Pinnacle fulfilled certain conditions, namely that Pinnacle be in "good financial standing" with LCE on the due date of each note.  DSUMF 115, Docket 179, Ex. 57 at 5.  In conjunction with the resolution of the debt, the parties executed a series of documents including two promissory notes, a

7

guaranty, a security agreement, and a release.  DSUMF 117.  The release

stated as follows:

> In consideration of Little Caesar Enterprises, Inc., a Michigan
> corporation, . . . and/or its affiliates or related entities,
> including, without limitation, Little Caesar National Advertising
> Program, Inc. (collectively referred to as "LCE"), providing
> financing to Pinnacle Pizza Company, Inc. ("Borrower") and
> James J. Fischer and Michael Nichols ("Guarantors") and for
> other good and valuable consideration, the receipt and
> adequacy of which are hereby acknowledged;
>
> Borrower and Guarantors and their subsidiaries, affiliates and
> related entities, and their respective past, present, and future
> officers, directors, shareholders, employees, agents,
> representatives, predecessors, successors and assigns hereby
> release and forever discharge LCE and their subsidiaries,
> affiliates and related entities, and their respective past, present,
> and future officers, directors, shareholders, employees, agents,
> representatives, predecessors, successors and assigns, from any
> and all complaints, claims, liabilities, damages, losses, injuries,
> actions, causes of action, suits, debts and expenses (including
> without limitation attorney fees) of every nature, kind, or
> description whatsoever, whether known or unknown,
> suspected, or unsuspected, vested or contingent, direct or
> indirect, arising out of any matter, fact, event, omission, or
> occurrence whatsoever occurring or omitted prior to the date
> and time this Release is executed, it being the express intention
> of the parties that this Release be as broad as permitted by law.
>
> Borrower and Guarantors expressly confirm that they have
> reviewed the effect of this Release with competent legal counsel,
> or have been afforded the opportunity to do so, prior to the
> execution of this release, and acknowledge and agree that LCE
> is relying upon this Release of claims.

Docket 179, Ex. 57 at 25.

The parties dispute whether the spring 2000 releases are governed by

South Dakota or Michigan law.  LCE asserts that Michigan law should govern

the May 2000 release because it was executed in connection with a series of documents related to Pinnacle's debt with LCE, which explicitly provide that Michigan law governs the transactions.  LCE further asserts that Michigan law governs the March 2000 release pursuant to South Dakota choice of law rules.

A review of the spring 2000 releases indicates that neither release contains a "choice of law" provision in the body of the release.  In diversity cases, federal courts must apply the choice of law rules of the forum state to determine which state's substantive law applies.  Retail Associates, Inc. v. Macy's East, Inc., 245 F.3d 694, 697 (8th Cir. 2001).  Under South Dakota law, "[a] contract must be construed in accordance with the law of the place where made unless it is shown that it was the intention of the parties to be bound by the law of some other place."  Briggs v. United Services Life Ins. Co., 117 N.W.2d 804, 807 (S.D. 1962).  "The test of the place of a contract is the place where the last act is done by either of the parties which is necessary to complete the contract and give it validity."  Id.

In this case the final step to complete both releases, the execution of the documents necessary to bring the releases into effect by LCE, occurred in Michigan, and accordingly, under South Dakota choice of law rules the releases are governed by Michigan law.  See Docket 179, Ex. 57, 60, 75.  This conclusion is also supported by the general applicability of Michigan law to Pinnacle's claims for breach of contract, as determined by this court.  Further,

9

the court finds that the intent of the parties was to have the May 2000 release governed by Michigan law, as it was executed in conjunction with a number of other loan documents which explicitly applied Michigan law.  <u>See</u> Docket 179, Ex. 57.

Under Michigan law:

> The scope of a release is governed by the intent of the parties as it is expressed in the release.  If the text in the release is unambiguous, the parties' intentions must be ascertained from the plain, ordinary meaning of the language of the release.  A contract is ambiguous only if its language is reasonably susceptible to more than one interpretation.  The fact that the parties dispute the meaning of a release does not, in itself, establish an ambiguity.

<u>Cole v. Ladbroke Racing Michigan, Inc.</u>, 614 N.W.2d 169, 176 (Mich. App. 2000).

After reviewing the language contained in the March 2000 release, the court finds that the release is limited to matters relating to the sale of the Iowa franchise.  The release of "all claims" is limited by the clause, "relating to or connected with the Franchise Agreements terminated hereby, the franchise relationship, the Little Caesar restaurants identified herein, or LCE and its related entities."  The court finds that the language in the release indicates that the parties did not intend the release to apply to all claims that could be asserted by Pinnacle, but rather only those claims related to the Iowa franchise.

10

LCE further argues that the second release signed in conjunction with the sale of the Iowa franchise releases it from liability from Pinnacle's breach of contract claim.  Whereas the March 2000 release limited its application to the parties involved in the franchise transfer, the language in the May 2000 release is not so limited in its scope.  Borrower and Guarantors, defined as Pinnacle Pizza and Fischer and Stewart, together with their "subsidiaries, affiliates and related entities" released LCE:

> [F]rom any and all complaints, claims, liabilities, damages, losses, injuries, actions, causes of action, suits, debts and expenses (including without limitation attorney fees) of every nature, kind, or description whatsoever, whether known or unknown, suspected, or unsuspected, vested or contingent, direct or indirect, arising out of any matter, fact, event, omission, or occurrence whatsoever occurring or omitted prior to the date and time Release is executed, it being the express intention of the parties that this Release be as broad as permitted by law.

Docket 79, Ex. 59 at 1.

Pinnacle argues that the May 2000 release should not operate to relieve LCE of its contractual obligations to Pinnacle, because a release cannot extend to unknown claims.  Further, Pinnacle argues that because LCE did not breach the Franchise Agreement until sometime during the fall of 2000, after the release was executed, the language of the release does not insulate LCE from liability.

A reading of the plain language of the May 2000 release demonstrates to the court that it was the intent of the parties to release Pinnacle of all claims,

11

both "known or unknown" at the time it was entered into.  This type of release is consistent with and enforceable under Michigan law.  See Dresden v. Detroit Macomb Hosp. Corp., 553 N.W.2d 387, 390 (Mich. App. 1996).

Because the court finds the release does apply to "all claims," the court must therefore determine whether Pinnacle's claim against LCE existed at the time of the May 2000 release.  Pinnacle asserts LCE did not breach its Franchise Agreement until *after* the release was signed, when LCE began to use the "Hot N' Ready" concept in corporate stores.  Docket 174 at 23.  As discussed in more detail below, the court finds that the alleged violation of the Franchise Agreement by LCE does not constitute a single continuing breach, but rather a series of actionable breaches.  Therefore, the court finds that the May 2000 release applies to all alleged wrongful conduct that occurred by LCE prior to May 1, 2000.

**B.    September 2001 Release**

LCE asserts that Pinnacle's failure to opt out of a class action lawsuit brought against LCE by its franchisees operates as a release of the claims brought in this case.  The class action was settled in September of 2001, and purports to release LCE from all claims of members of the class.  Docket 179, Ex. 61.  The settlement agreement contains both a release and a choice of law provision, which indicates that Michigan law governs construction of the

agreement.  As a result, the court finds that Michigan law governs the September 2001 release.

Pinnacle argues that because the claims it asserts in this case are not related to the claims that were resolved in the class action lawsuit, the 2001 release does not operate as a release with respect to the instant claims.

The court finds that the 2001 release should not be construed to operate against claims unrelated to the class action lawsuit.  Although this appears to be an issue of first impression in Michigan, this result is consistent with that reached by other jurisdictions that have considered the issue.  In TBK Partners, Ltd. v. Western Union Corporation, 675 F.2d 456, 461 (2$^d$ Cir. 1982), the Second Circuit held that a release contained in a class action settlement should only be effective "where there is a realistic identity of issues between the settled class action and subsequent suit, and where the relationship between the suits is at the time of the class action foreseeably obvious to notify class members."  See also Thompson v. Edward D. Jones & Co., 992 F.2d 187, 190-91 (8th Cir. 1993).

LCE argues that the "identity of issues" test for determining the scope of a class action release, as discussed in Thompson, has been disregarded in the Eighth Circuit, citing In re General American Life Insurance Company Sales Practices Litigation, 357 F.3d 800 (8th Cir. 2004).  In General American Life the plaintiff brought an action against the defendant asserting that the

13

defendant was guilty of omissions and nondisclosures in relation to her insurance policy's premium charges and fees.  Id. at 802.  Prior to bringing that suit, however, the plaintiff was part of a class action lawsuit against the defendant for improper billing practices.  Id.  Under those circumstances, the court found that the general release executed in the class action lawsuit barred plaintiff's subsequent claim.  Id.

Although the Eighth Circuit in General American Life found that the general release in the class action lawsuit acted as a bar to plaintiff's claim, it is significant that the plaintiff's claim was substantially similar to the claim brought in the class action.  While the court did not explicitly address the "identity of issues" test mentioned in Thompson, it appears from the facts of General American Life that if the Thompson test had been applied, the test would have been satisfied.  Therefore, the court does not find LCE's reliance on General American Life convincing.

LCE argues that even if the court adopts the "identity of issues" analysis, the release bars Pinnacle's claim in the instant action because the release expressly provided the release of claims including "advertising by LCNAP and LCE."  Docket 188 at LCE.  Nonetheless, a review of the settlement agreement does not indicate that the dispute had any relation to Pinnacle's claim for breach of contract for use of the "Hot N' Ready" concept.  Such a claim is unique to a single franchisee, and the court finds that any relationship

14

between the class action lawsuit and Pinnacle's instant claim was not "foreseeably obvious" to notify Pinnacle of the effect of its decision to not opt out. Accordingly, the court finds that the September 2001 release does not operate as a release to Pinnacle's claims in this case.

### C.     November 2003 Release

Finally, both parties seek summary judgment on the applicability of a release dated November 4, 2003, which was signed in connection with the sale of a store operated by Fischer and Nichols in St. Cloud, Minnesota.[1] The language of the 2003 release, contained in the franchise termination and surrender agreement, is identical to the March 2000 release that was signed in conjunction with Pinnacle's sale of the Iowa Little Caesar's franchise. As discussed with regard to that release, the language of the release limits itself to claims relating to the franchise being surrendered, and therefore does not operate as a general release of liability between Pinnacle and LCE. Accordingly, the court finds that the November 2003 release does not act as a bar to Pinnacle's claims in this case.

-----

[1]In response to LCE's statements of undisputed material facts, Pinnacle asserts that Pinnacle never owned the St. Cloud franchise, but that it was owned by Hot N' Ready Pizza Company of Minnesota, a limited liability company owned by Fischer and Nichols. Pinnacle points to no documentary evidence that provides conclusive support for this assertion, but because the court finds that the release does not apply to the claims in this case, the court need not further investigate whether Pinnacle was a party to the release.

## II.    Statute of Limitations

LCE moves for summary judgment on several of Pinnacle's claims, asserting that they are barred by the applicable statute of limitations.  "A federal court exercising diversity jurisdiction is required to apply the law of the forum state when ruling on statutes of limitations." Nettles v. America Tel. & Tel. Co., 55 F.3d 1358, 1362 (8th Cir. 1995).  As was the case in Nettles, the forum state in this case, South Dakota, regards statutes of limitations as procedural and therefore this court must apply the South Dakota statutes of limitations in resolving this case.  Nettles, 55 F.3d at 1362, Matter of Estate of Lingscheit, 387 N.W.2d 738 (S.D. 1986).

### A.    Breach of Contract

Under South Dakota law, the statute of limitations for Pinnacle's breach of contract claim is six years.[2]  SDCL 15-2-13.  Pinnacle filed the complaint in this action on October 25, 2004.  LCE argues that because the first alleged breach of the Franchise Agreement occurred before October 25, 1998, the breach of contract claim accrued before that date and the claim is therefore barred by the statute of limitations.

---

[2]Although this court adopts the six-year statute of limitations for a breach of contract claims as set forth by South Dakota law, the timing of any alleged breach is governed by Michigan law, as the claim itself is governed by Michigan law.  Docket 69 at 8-9.

The parties dispute when LCE first allegedly breached its contract by using Pinnacle's "original advertising materials."  Pinnacle first began using the phrase "Hot N' Ready" in conjunction with the sale of pre-made pizzas in May of 1997.  Pinnacle shared the success of the "Hot N' Ready" concept with fellow franchisees, including Scott Stewart, shortly thereafter.

LCE asserts that it began promoting the "Hot N' Ready" concept to its franchisees shortly after Pinnacle began to use the concept.  LCE asserts that Scott Stewart began making presentations regarding the "Hot N' Ready" idea at a Little Caesar's convention, which was open to all franchisees in October of 1997.  During that convention, LCE distributed to all franchisees a booklet of marketing ideas that included a description of the "Hot N' Ready" promotion.  LCE asserts that it gave over a hundred store marketing presentations regarding the "Hot N' Ready" promotion in 1997 and 1998.  Pinnacle does not dispute that the "Hot N' Ready" idea was used by LCE as early as 1997, but Pinnacle argues that LCE's actions did not breach the Franchise Agreement until it began using the "Hot N' Ready" concept in its corporate owned stores:

> Pinnacle does not and has never claimed that LCE breached the Franchise Agreement by becoming aware of or by talking about [the "Hot N' Ready" concept].  Instead, LCE breached the Franchise Agreement by doing just what the Agreement prohibits: namely, by *using* Pinnacle's original advertising without Pinnacle's prior consent.

Docket 193 at 11.

17

Pinnacle does not cite, and the court is unaware of, any authority in support of the distinction it attempts to draw between LCE's *use* of the "Hot N' Ready" concept  in conjunction with its franchisees and *use* of the "Hot N' Ready" concept by its corporately owned stores.  By distributing materials regarding the "Hot N' Ready" concept to its franchisees, LCE was promoting the use of the "Hot N' Ready" concept.  Further, letters sent by LCE franchise managers confirm that LCE was affirmatively suggesting that franchisees use the "Hot N' Ready" concepts as a part of their business.  DSUMF 103.  Use of the "Hot N' Ready" concept, and the additional sales the concept was thought to produce, resulted in a direct financial benefit to LCE in the form of increased royalty payments.  See Franchise Agreement, Section X.A., Docket 101 at 8.  Accordingly, the court finds that to the extent LCE's promotion of the "Hot N' Ready" concept without Pinnacle's written authorization violated the Franchise Agreement, any such violation began when LCE affirmatively promoted the use of the concept to its franchisees, which was prior to October 25, 1998.

Pinnacle argues that the contractual duty set forth in the Franchise Agreement is a continuing duty, and therefore even if it was first breached in September of 1997, each subsequent use of the "original advertising materials" constitutes a separate and actionable breach for purposes of the applicable statute of limitations.  Pinnacle relies on H.J. Tucker & Associates, Inc. v.

18

Allied Chucker & Engineering Co., 595 N.W.2d 176 (Mich. App. 1999), for the

proposition that repeated breaches of a contract give rise to separate claims for

breach of contract.  In Tucker, plaintiff sought damages for nonpayment of

commissions due under a contract.  Tucker, 595 N.W.2d at 179.  The

commissions earned by the plaintiff were separately computed and were to be

paid monthly.  Id. at 183.  Under those factual circumstances, the court found

that each failure to make a periodic payment was an individual breach of

contract.  Id.

LCE argues that Pinnacle's reliance on H.J. Tucker is unavailing

because the Michigan courts in Blazer Foods, Inc. v. Restaurant Properties,

Inc., 673 N.W.2d 805 (Mich. App. 2003) rejected the continuing wrong doctrine

in contract cases.  "Under the continuing wrong doctrine, 'an alleged timely

actionable event will allow consideration of and damages for connected

conduct that would be otherwise barred.' "  Blazer Foods, 673 N.W.2d at 809

(quoting Sumner v. Goodyear Tire & Rubber Co., 398 N.W.2d 368 (Mich.

1986)).

In Blazer Foods, restaurant franchisees brought a claim against the

franchisor, asserting that the franchisor failed to fulfill its obligations under

the franchise agreement.  Id.  The court found that because plaintiffs admitted

that the franchisor failed to properly perform under the contract more than six

years prior to when the complaint was filed, the breach of contract claim was

19

time barred. Id. at 809. The court in Blazer Foods rejected the plaintiffs'
contention that their claim was saved under the continuing wrong theory,
which plaintiffs argued was extended to breach of contract claims by H.J.
Tucker. Id. at 810. The court explicitly recognized, however, the possibility
that the plaintiffs could partially recover under a multiple breach theory. Id.
at 812 ("It is possible that some recovery would be appropriate in the instant
case under the reasoning of H.J. Tucker."). But the court did not reach the
issue because it found the argument was not timely raised by the plaintiffs.
Id.

LCE mischaracterizes Pinnacle's argument as it relates to the alleged
continuing nature of LCE's breaches of the Franchise Agreement. Pinnacle
does not assert that the alleged breaches of contract constitute a continuing
wrong, but rather that by using the "Hot N' Ready" concept without receiving
written permission, LCE's conduct constituted repeated actionable breaches.
Under Pinnacle's theory, Pinnacle could recover damages for any breaches
which occurred after October 25, 1998.

Because Pinnacle raised this argument in a timely manner, this court
must address the issue left open in Blazer Foods, namely, whether LCE's
alleged improper use of the "Hot N' Ready" concept gives rise to multiple
actionable breaches or if LCE's alleged improper use consists of one continual
breach which began prior to October of 1998.

LCE cites <u>Shatterproof Glass Corporation v. Guardian Glass Company</u>, 322 F. Supp. 854 (E.D. Mich. 1970), for the proposition that "[t]he cause of action arises but once."  Docket 188 at 14.  In <u>Shatterproof Glass</u>, the plaintiff brought a claim against the defendant for misappropriation of trade secrets. <u>Id.</u> at 863-64.  The court found that the claim was barred by the statute of limitations, and it rejected plaintiff's claim that the tort of misappropriation of trade secrets was a continuing offense.  <u>Id.</u> at 869.  " "The fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated.  The cause of action arises but once.' " <u>Id.</u> at 870 (quoting <u>Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.</u>, 407 F.2d 288, 293 (9th Cir. 1969)).

The court finds that the present case is distinguishable from the factual situation in <u>Shatterproof Glass</u> and therefore the logic of <u>Shatterproof Glass</u> is not controlling.  The allegations in this claim stem from a cause of action for breach of contract rather than misappropriation of trade secrets.  Unlike misappropriation of trade secrets, multiple breaches can arise from a single contract because the relationship between the parties continues despite the breach.  "When one party to a contract materially breaches the contract by failing to perform duties under it, the other party can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach." <u>Blazer Foods</u>, 673 N.W.2d at 813 n.7

21

(citing <u>Schnepf v. Thomas L. McNamara, Inc.</u> 93 N.W.2d 230 (Mich. 1958)).

"Thus, when one elects to continue performance and a second breach occurs,

it should give rise to a separate claim for specific damages arising from the

second breach, whether or not the contract is deemed an installment

contract." <u>Id.</u> (citing <u>H.J. Tucker</u>, 595 N.W.2d at 576).

In the present case it is alleged that LCE initially encouraged the use of

the "Hot N' Ready" concept by franchisees without seeking written permission

from Pinnacle.  Pinnacle continued performing under the Franchise Agreement

despite this alleged breach, and sought to obtain compensation from LCE.  The

court finds that LCE's subsequent breaches of the Franchise Agreement

therefore give rise to actionable claims.  Accordingly, the court finds that any

alleged breaches of the Franchise Agreement that occurred prior to

October 25, 1998, are barred by the statute of limitations, but that alleged

breaches which occurred after October 25, 1998, are not barred.

### B.    Breach of Fiduciary Duty

Under South Dakota law, a claim for breach of fiduciary duty is subject

to a six-year statute of limitations.  SDCL 15-2-13(1).  For the same reasons

set forth with respect to the breach of contract claim discussed above, the

court finds that assuming *arguendo* Pinnacle has a claim against LCE for

breach of fiduciary duty, each breach of that duty is actionable.  Accordingly,

22

the statute of limitations bars only any breaches that occurred prior to October 25, 1998.

### C.    Breach of South Dakota Franchise Act

Under South Dakota law, a claim for breach of the South Dakota Franchise Act is subject to a six-year statute of limitations.  SDCL 15-2-13(2). For the same reasons set forth with respect to the breach of contract claim discussed above, the court finds that assuming *arguendo* Pinnacle has a claim against LCE for breach of the South Dakota Franchise Act, each breach of that duty is actionable.  Accordingly, the statute of limitations bars only any alleged breaches that occurred prior to October 25, 1998.

### III.    Equitable Doctrines

LCE moves for summary judgment on its affirmative defense of laches and/or estoppel.  Pinnacle also moves for summary judgment, asserting that LCE's reliance on equitable defenses fails as a matter of law.  In order to prevail on a laches defense, LCE must demonstrate that "the passage of time combined with a change in condition . . . would make it inequitable" for Pinnacle to enforce a claim against LCE.  Lothian v. Detroit, 324 N.W.2d 9, 13-14 (Mich. 1982); see also Conway v. Conway, 487 N.W.2d 21, 24 (S.D. 1992). Estoppel arises when "by conduct or acts, a party has been induced to alter his position or do that which he would not otherwise have done to his prejudice." In re Estate of Williams, 348 N.W.2d 471, 475 (S.D. 1984); see also

23

Westfield Cos. v. Grand Valley Health Plan, 568 N.W.2d 854, 856-57 (Mich. App. 1997).

LCE asserts that Pinnacle had knowledge of LCE's alleged unlawful conduct and "yet it chose to sit on its hands and watch without protest as LCE spent millions of dollars promoting 'hot and ready.' " Docket 180 at 16. Pinnacle asserts that Fischer informed LCE as early as 1999 that it had rights to the "Hot N' Ready" concept, and increased its efforts to assert those rights when LCE began to utilize the "Hot N' Ready" concept on a national level. PSUMF at ¶ 22, Docket 193 at 14.

After reviewing the record the court finds that questions of material fact exist as to whether the equitable doctrines of laches and estoppel apply as a matter of law. Accordingly, both parties' motions for summary judgment on the equitable defenses asserted by LCE are denied.

## IV.   Merits

### A.   Breach of Contract

LCE moves for summary judgment on Pinnacle's breach of contract claim, asserting that Pinnacle's "Hot N' Ready" concept does not constitute "original advertising materials" under the Franchise Agreement. Pinnacle argues that two sections of the Franchise Agreement, when read together, demonstrate that Pinnacle has rights to the "Hot N' Ready" concept and that those rights were violated by LCE.

24

"Where a contract is to be construed by its terms alone, it is the duty of the court to interpret it; but where its meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury." Klapp v. United Insurance Group Agency, Inc., 663 N.W.2d 447, 454 (Mich. 2003) (quoting O'Connor v. March Automatic Irrigation Co., 242 N.W. 784 (Mich. 1928)). A contract is ambiguous when, by giving effect to the entirety of the contract, the provisions are capable of conflicting interpretations. Klapp, 663 N.W.2d at 453. If the contract is ambiguous, extrinsic evidence may be used by the jury to discern the intent of the parties. Id. at 454.

Section V of the Franchise Agreement governs "Proprietary Marks and Inventions." Docket 179, Ex. 1. Section V.A. sets forth restrictions on the use of proprietary marks owned by LCE. Id. Section V.A. states that "LITTLE CAESAR and its licensees have the sole right to use such trademarks, service marks, and trade names, presently existing or to be acquired in the future[.]" Id. Section V.B. further states:

> Franchise Owner expressly acknowledges that any and all goodwill associated with said Proprietary Marks, including any goodwill which might be deemed to have arisen or to arise in the future through the activities of any Licensee of LITTLE CAESAR, inures directly and exclusively to the benefit of LITTLE CAESAR.

Id.

Section V.F. states:

25

>Any and all improvements or modifications in the LITTLE CAESAR System, franchise trade secrets, or know-how licensed hereunder whether made by LITTLE CAESAR or by Franchise Owner or by another LITTLE CAESAR licensee, shall be and become the sole property of LITTLE CAESAR which shall have the sole and exclusive right to patent, copyright, register, or otherwise protect the same; provided, however, that in no event shall advertising created by Franchise Owner be considered to be an "improvement or modification in the LITTLE CAESAR System."

Id.

Section XII of the Franchise Agreement governs "Advertising."  The preamble to Section XII recognizes the "value of advertising and the importance of standardized advertisements and promotions to further the acceptance and public image of the LITTLE CAESAR System."  Id.  Section XII.A. provides that "[u]pon request and without charge, LITTLE CAESAR shall provide advertising mats suitable for handbills and newspaper advertising."  Id.

The bulk of Section XII pertains to the responsibilities of the Franchise Owner to engage in advertising expenditures, spending a portion of their gross receipts and using cooperative advertising.  Section XII concludes:

>D.  Franchise Owner, at its sole expense, may utilize LITTLE CAESAR's television and radio advertising materials (for its sole benefit or jointly with other LITTLE CAESAR Franchisees), by dealing directly with LITTLE CAESAR's advertising agency.  LITTLE CAESAR may not use the original advertising materials created by Franchise Owner without its prior written consent.

>E.  Franchise Owner may use any source in preparing, printing or producing advertising or promotional material, provided, however, such material shall adhere to the advertising

26

standards as may be prescribed by LITTLE CAESAR from time to time.

Id.

Pinnacle argues Section XII.D., when read in conjunction with Section V.F., demonstrates that it had legal rights to the "Hot N' Ready" phrase and concept, and further that those rights were violated when LCE used the concept without prior written consent.  LCE moves for summary judgment on the claim, arguing that when interpreted properly it is clear that Pinnacle's breach of contract claim fails as a matter of law.

In order to determine whether the conduct alleged by LCE constitutes a breach of the Franchise Agreement, the court must determine the meaning of the term "original advertising materials."  "Original advertising materials" is not defined in the Franchise Agreement.  Under Michigan law, "where a term is not defined in a contract, we will interpret such term in accordance with its commonly used meaning."  Bloomfield Estates Improvement Ass'n, Inc. v. City of Birmingham, 737 N.W.2d 670 (Mich. 2007) (internal quotations omitted).

Under the terms of the Franchise Agreement, the court finds that the rights retained by Pinnacle under the Franchise Agreement are limited to rights in its actual advertising material, that is, any written materials or audio or television materials that it created.  The court reaches this conclusion first by looking at the language and rights of the Franchise Owner set forth in Section XII.D.  Section XII.D. protects Pinnacle's rights in "original advertising

27

*materials.*"  The word "materials," as used in the Franchise Agreement,

indicates that Pinnacle's rights are protected in its physical advertising

creations.  If the parties had intended advertising "slogans" or advertising

"concepts" to be protected, the parties could have specifically included that in

this section of the Franchise Agreement.  <u>See, e.g.</u>,  Docket 179, Ex. 1, Section

V.F. (describing the parties' rights in "know-how"); Section XII (recognizing the

"importance of standardized advertisements *and* promotions").  This is

consistent with the use of the word "material" in the paragraph immediately

following the one at issue in this case, which allows the Franchise Owner to

use any source to prepare physical advertising materials.  <u>See</u> Docket 179, Ex.

1, Section XII.E.

   This finding is supported by the application of principles of contract

interpretation.  Under the principle of *ejusdem generis* "where a general term

follows a series of specific terms, the general term is interpreted to include only

things of the same kind, class, character, or nature as those specifically

enumerated."  <u>Brown v. Farm Bureau Gen. Ins. Co. of Mich.</u>, 730 N.W.2d 518,

522 (Mich. App. 2007).  Section XII.D. first sets forth the rights of the

Franchise Owner to utilize television and radio advertising materials by dealing

with the Little Caesar's advertising agency.  In the second sentence, it protects

the rights of the Franchise Owner from the nonconsensual appropriation of its

advertising materials.  Accordingly, under *ejusdem generis*, the term "original

advertising materials" is limited to materials similar to audio and television materials, which would include written materials.  But, it is limited to those types of materials and does not include related ideas or concepts.

This interpretation is further reinforced by reviewing the Franchise Agreement as a whole.  See Bloomfield Estates, 737 N.W.2d at 675 ("[U]nder the doctrine of *noscitur a sociis* a word or phrase is given meaning by its context or setting.") (internal quotations omitted); see also Klapp, 663 N.W.2d at 453 ("[C]ourts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare an ambiguity.  Instead, contracts must be construed so as to give effect to every word or phrase as far as practicable.") (internal quotations omitted).  The phrase "original advertising materials" is within the context of Section XII, which deals entirely with advertising materials and the obligations of Franchise Owners with regard to advertising.  By contrast, proprietary marks and inventions are governed by Section V.  As set forth above, Section V.F. reserves for Little Caesar all rights with regard to "improvements or modifications in the Little Caesar System . . . or know-how," whether created by Little Caesar or the Franchise Owner. Although Section V.F. contains a clause stating that "in no event shall advertising created by Franchise Owner be considered to be an improvement or modification in the Little Caesar System" the court does not find that that phrase expands the definition of "original advertising materials" discussed

29

above.  There is no language in the agreement supporting this expansive

reading.  Rather, the court finds that the phrase is a cross reference to Section

XII.D., and does not expand the definition of the term contained in that

section.

The phrase "Hot N' Ready" is undoubtedly a phrase that has value to the

Little Caesar's franchise.  The Franchise Agreement is clear, however, that LCE

has rights in both pre-existing and newly created "trademarks, service marks,

and trade names."  Docket 179, Ex. 1, Section V.A.  The Franchise Agreement

further clearly states that all goodwill associated with proprietary marks,

whether it comes about as a result of the conduct of LCE or a Franchise

Owner, inures to LCE.  Docket 179, Ex. 1, Section V.B.  As discussed above, if

the parties intended that Franchise Owners should retain rights in original

phrases or concepts, the parties could have included such intellectual property

protection in the contract.

In summation, Section V of the Franchise Agreement extensively sets

forth the rights of the parties with respect to proprietary marks and

inventions.  Construing the Franchise Agreement as a single document, the

court finds Pinnacle's assertion that its rights in "original advertising

materials" encompasses the proprietary marks and promotional ideas

described in Section V is not a reasonable interpretation of the contract.

30

After reviewing the Franchise Agreement, the court finds that when considered as a whole the language of the Franchise Agreement does not give rise to multiple interpretations, and therefore is not ambiguous.  As a result, the use of extrinsic evidence is not necessary to determine the intent of the parties when the contract was formed.  Because the court finds that Pinnacle had rights only in its original physical advertising material under the Franchise Agreement, and because it is undisputed that LCE did not use Pinnacle's physical advertising materials, LCE's motion for summary judgment on Pinnacle's breach of contract claim is granted.

### B.      Breach of Fiduciary Duty

LCE moves for summary judgment on LCE's claims of breach of fiduciary duty, as construed by this court.  LCE argues that no fiduciary relationship exists under the terms of the Franchise Agreement.  Section XIV of the Franchise Agreements states in part, "[t]his Agreement shall not be construed to establish any manner of fiduciary relationship between the parties."  Docket 179, Ex. 1.  Pinnacle argues that under Arnott v. American Oil Company, 609 F.2d 873, 881 (8th Cir. 1979), which stated that "inherent in a franchise relationship is fiduciary duty," such a duty exists regardless of the language of the Franchise Agreement.

While Arnott did contain language suggesting that a franchise
relationship always created a fiduciary duty, the Eighth Circuit has
subsequently explained that not to be the case:

> We have construed the holding in Arnott differently, as resting on
> the implied covenant of good faith and fair dealing, and have held
> that a franchise or other ordinary business relationship does not
> alone create fiduciary duties.

Cambee's Furniture, Inc. v. Doughboy Recreational, Inc., 825 F.2d 167, 171
(8th Cir. 1987) (applying South Dakota law and holding that no fiduciary
relationship existed as a result of a franchisor/franchisee relationship).

Pinnacle's citation to SDCL 37-5A-86, which was enacted in 1974, does
not save its assertion of an implied fiduciary duty.  In relevant part, SDCL 37-
5A-86 states "[a]ny condition, stipulation or provision purporting to waive
compliance with any provision of [the Franchise Act] or any rule or order
thereunder is void."  A review of the South Dakota franchise laws, however, do
not indicate that a franchise relationship necessarily carries with it a fiduciary
duty between the parties.  Therefore, SDCL 37-5A-86 does not void the portion
of the Franchise Agreement which expressly disclaims any fiduciary
relationship between Pinnacle and LCE.  Further, under South Dakota law,
"fiduciary duties are not inherent in normal arm's-length business
relationships, and arise only when one undertakes to act primarily for
another's benefit."  Taggart v. Ford Motor Credit Co., 462 N.W.2d 493, 500
(S.D. 1990).  Because the parties expressly disclaimed the existence of a

fiduciary relationship, and because such a relationship is not created by operation of law, LCE's motion for summary judgment on Pinnacle's claim for breach of fiduciary duty is granted.[3]

### C.    South Dakota Trademark Claim

LCE moves for summary judgment on Pinnacle's South Dakota trademark claim under SDCL 37-6-3.  LCE argues that Pinnacle's claim fails to the extent that Pinnacle argues South Dakota law applies to conduct engaged outside the borders of South Dakota.  LCE further argues that Pinnacle has no claim within the borders of South Dakota, because the only advertising conducted there was done either by Pinnacle or by the locally owned stores operated by Stewart.  Pinnacle asserts that LCE's argument fails for the same reason its motion for judgment on the pleading on that claim failed and sets forth no new argument at this stage of the litigation.

In this court's order denying LCE's motion for judgment on the pleadings, the court found, construing the complaint liberally in the light most favorable to Pinnacle, that Pinnacle had "alleged sufficient facts to survive a motion for judgment as a matter of law."  Docket 69 at 23.  LCE did not argue

---

[3]The court has never explicitly determined whether the breach of fiduciary duty claim arises under South Dakota or Michigan law.  See Docket 99 at 8. But the result would be unchanged if this court were to apply Michigan law, because the Michigan courts have "been reluctant to extend the cause of action for breach of fiduciary relationship beyond the traditional context."  See, e.g., Bero Motors v. General Motors Corp., 2001 WL 1167533, at *4 (Mich. App. 2001) (unpublished).

at that stage of the litigation that SDCL 37-6-3 was applicable only to conduct occurring in South Dakota, and Pinnacle at no point responded to that argument.  <u>See</u> Docket 30 at 20-21.

> Under the Commerce Clause, a state regulation is per se invalid when it has an "extraterritorial reach," that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state. . . .  The Commerce Clause precludes application of a state statute to commerce that takes place wholly outside of the state's borders.

<u>Cotto Waco Co. v. Williams</u>, 46 F.3d 790, 793 (8th Cir. 1995) (citing <u>Healy v. Beer Inst.</u>, 491 U.S. 324, 336, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989)).

Pinnacle does not dispute that LCE did not use the "Hot N' Ready" advertisement in South Dakota.  DSUMF 140.  Further, Pinnacle does not dispute that there are no franchise stores in South Dakota, except those owned by Pinnacle and Stewart.  DSUMF 75.[4]  Pinnacle also acknowledges that the franchises owned by Stewart used the "Hot N' Ready" concept with Pinnacle's permission.  DSUMF 83-85.  Under the facts of this case, the court finds that Pinnacle has not alleged any conduct actionable under SDCL 37-6-3

---

[4]Pinnacle does assert that "from time to time, there have been Little Caesars' Pizza locations in K-Mart stores throughout South Dakota."  Plaintiff's Response to Defendants' Statement of Undisputed Material Facts, Docket 194 at 2. Beyond this bare assertion, Pinnacle does not provide any information regarding when the K-Mart stores were in existence, and further if they ever used the "Hot N' Ready" concept to the extent to expose defendants to liability under SDCL 37-6-3.

that occurred in the state of South Dakota.  The court grants summary judgment against Pinnacle on its claim under South Dakota trademark law because South Dakota trademark law, to the extent it is applicable to the conduct alleged by these claims, cannot extend to "extraterritorial conduct."

### D.   Pinnacle's Trademark Cancellation Claim

LCE moves for summary judgment on Pinnacle's claim seeking to cancel LCE's trademark on the phrase "Hot N' Ready."  Count VIII of Pinnacle's second amended complaint asserts that the trademark was registered in bad faith, and therefore Pinnacle asks this court to cancel the registration.  LCE concedes that this court has the power to order cancellation of the trademark, but argues that Pinnacle has not met the high standard required to demonstrate fraud.  Pinnacle argues that fraud is demonstrated by LCE's admission that it used Pinnacle's date of first use in its application for trademark registration.  Pinnacle further argues that because LCE has no ownership rights in the "Hot N' Ready" phrase, its registration should be cancelled.

"Cancellation [of a fraudulently procured trademark registration] is a discretionary matter for the district court."  Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc., 989 F.2d 985, 993 (8th Cir. 1993).  "The party seeking cancellation for fraudulent procurement 'must prove the alleged fraud by clear and convincing evidence.' " 3M Co. v. Intertape Polymer Group, Inc., 423 F.

35

Supp. 2d 958, 962 (D. Minn. 2006) (quoting <u>L.D. Kichler Co. v. Davoil, Inc.</u>, 192 F.3d 1349, 1351 (Fed. Cir. 1999)).  Further, "[a] party making a claim of fraud . . . is under a 'heavy burden.' " <u>Intertape Polymer Group</u>, 423 F. Supp. 2d at 962 (quoting <u>Marshall Field & Co. v. Mrs. Fields Cookies</u>, 25 U.S.P.Q.2d 1321, 1328 (Trademark Tr. & App. Bd. 1992)).

In this case, the court finds that Pinnacle has not met its burden to demonstrate that LCE fraudulently procured the trademark for the "Hot N' Ready" phrase as a matter of law.  First, LCE's use of May 7, 1997, as the date of first use of the phrase is not improper under the terms of the Franchise Agreement.  15 U.S.C. § 1055 states:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.

In this case, under the terms of the Franchise Agreement as discussed above, rights in the "Hot N' Ready" phrase and goodwill that inures as a result of the use of the phrase became the property of LCE upon its use by the franchisee.  <u>See</u> Docket 179, Ex. 1, Section V.B.  Therefore, LCE's recitation of the date of first use by its franchisor in conjunction with its registration of the mark is not unreasonable.  Pinnacle has not set forth any evidence that LCE knowingly made false, material representations of fact in connection with its attempt to trademark the phrase "Hot N' Ready."  <u>See Intertape Polymer</u>

36

Group, 423 F. Supp. 2d at 961.  Accordingly, LCE's motion for summary judgment on that claim is granted.

### E.      South Dakota Franchise Act Claim

LCE moves for summary judgment on Pinnacle's claim under the South Dakota Franchise Act.  Pinnacle argues that LCE engaged in "unfair and inequitable" conduct through its use of the "Hot N' Ready" phrase.  SDCL 37-5A-66(7).  As discussed above, the court finds that LCE did not breach its contract through the use of the "Hot N' Ready" phrase and concept because the phrase and concept were not "original advertising materials" protected under the Franchise Agreement.  Accordingly, because LCE did not breach its obligations under the Franchise Agreement, the court finds that LCE did not act in an "unfair and inequitable" manner under the South Dakota Franchise Act.  Therefore, LCE's motion for summary judgment on that claim is granted.

### F.      LCE's Other Claims

Because the court grants summary judgment in favor of LCE on all claims asserted by Pinnacle, to the extent LCE moves this court to strike the alleged inappropriate remedies, the court denies the motion as moot.  The court also denies Pinnacle's motion to permit the use of confidential information at trial as moot.

Pinnacle also alleges that Ilitch Holdings, Inc. (IHI) is vicariously liable for the acts of LCE.  Because the court has granted summary judgment in

favor of LCE, IHI cannot be held vicariously liable for the acts of LCE.  As a result, the court grants LCE's motion to dismiss IHI from this action.

## V.      LCE Counterclaim

LCE filed a counterclaim in its answer to the second amended complaint asserting that Pinnacle breached the Franchise Agreement by seeking to cancel LCE's registration of the "Hot N' Ready" trademark.  Section V.A.2. of the Franchise Agreement states:

> Franchise Owner expressly covenants that during the term of this Agreement, and after the termination or expiration thereof, the Franchise Owner shall not directly or indirectly contest or aid in contesting and/or consent to a third party contesting the validity or ownership of said Proprietary Marks.

Docket 179, Ex. 1 at 5.

Pinnacle moves for summary judgment on LCE's counterclaim, asserting that because the Franchise Agreement protects its rights in advertising, LCE cannot assert a counterclaim as a result of Pinnacle's attempt to vindicate its rights under the Franchise Agreement.  The court finds that Pinnacle has not met its burden in demonstrating that there are no material disputes of fact and that it is entitled to judgment as a matter of law on LCE's breach of contract counterclaim.  Accordingly, Pinnacle's motion for summary judgment on the counterclaim is denied.

Based on the foregoing, it is hereby

ORDERED that Pinnacle's motion for partial summary judgment (Docket 173) is denied.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Docket 178) is granted.

IT IS FURTHER ORDERED that plaintiff's motion to permit the use of confidential information at trial (Docket 175) is denied as moot.

IT IS FURTHER ORDERED that defendants' motion to exclude (Docket 215) is denied as moot.

Dated June 5, 2008.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE